**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

FILED
JAMES J. WALDRON
APR 2,3 2013
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

|  |  |
|---|---|
| **In Re:**<br><br>**U.S. MORTGAGE CORP. & CU NATIONAL MORTGAGE, INC.,**<br><br>         **Debtors.** | Chapter 11<br><br>Case No.: 09-14301(RG) |
| **EDWARD P. BOND, Liquidating Trustee**<br><br>         **Plaintiff,**<br><br>v.<br><br>**NATIONAL FINANCIAL SERVICES and JP TURNER & Co., LLC,**<br><br>         **Defendant(s).** | Adv. No.: 11-1216(RG)<br><br>         **OPINION** |

<u>APPEARANCES:</u>

Forman Holt Eliades Ravin & Youngman LLC
BY:   Erin J. Kennedy, Esq.
        Brigette G. McGrath, Esq.
80 Route 4 East
Paramus, New Jersey 07652
*Attorney(s) for Edward P. Bond, Liquidating Trustee*

Riker, Danzig, Scherer, Hyland & Perretti, LLP
BY:   Mark E. Hall, Esq.
        John R. Vales, Esq.
        Tara J. Schellhorn, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
*Attorney(s) for Defendant J.P. Turner & Co. LLC*

<u>Rosemary Gambardella, Bankruptcy Judge</u>

MATTER BEFORE THE COURT

The matters before the Court are (1) Defendant J.P. Turner & Co. LLC's ("J.P. Turner's") Motion to Dismiss All Non-Section 548(a)(1)(A) Claims of the Second Amended Complaint to Avoid and Recover Transfers and All Time-Barred Section 548(a)(1)(A) Claims Contained Therein;  (2) J.P. Turner's Motion for Summary Judgment and (3) a Cross-Motion for an Order Authorizing the Liquidating Trustee (the "Trustee") for U.S. Mortgage Corp. ("U.S. Mortgage") and CU National Mortgage, LLC ("CU National") to File a Second Amended Complaint, pursuant to Rule 15 of the Federal Rules of Civil Procedure, as made applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure.  A hearing was conducted on May 21, 2012.  The following constitutes this Court's findings of fact and conclusions of law.

BACKGROUND AND PROCEDURAL HISTORY

U.S. Mortgage was a licensed mortgage banker that originated and brokered residential mortgage loans to the public.  Its president, Michael J. McGrath, Jr., ("McGrath"), was also the controlling shareholder during its existence.  CU National was a wholly-owned subsidiary of U.S. Mortgage that was also operated by McGrath in his role as president and controlling shareholder. *See* Proposed Second Amend. Compl. ¶¶ 11-15.  The Trustee alleges here that at all relevant times, U.S. Mortgage and CU National were alter egos of McGrath, and that prior to the CU National Petition Date, through McGrath and/or McGrath and his wife Susan McGrath, the Debtors held brokerage accounts with Defendants.

In or about 1996, U.S. Mortgage was licensed to be a designated seller and servicer of loans for Fannie Mae, and in or about 1998, it entered the business of processing, servicing, and sometimes selling to Fannie Mae mortgage loans originated and/or funded by credit unions. Those loans were either sold to Fannie Mae by authorization of the credit unions or were

serviced by CU National, which collected the monthly payments of principal, interest, and any escrows for taxes and insurance from the borrowers and transmitting those payments to the credit unions. Amend. Compl. ¶¶ 16-19.

If U.S. Mortgage received express written authorization to sell the loans to Fannie Mae, U.S. Mortgage serviced the loans (the "Fannie Mae Loans") by collecting the monthly payments of principal, interest, and any escrows for taxes and insurance from the borrowers and transmitting those payments to Fannie Mae. Those payments were earmarked and maintained in segregated bank accounts. Amend. Compl. ¶¶ 19-20. Proceeds from the Fannie Mae Loans were deposited into U.S. Mortgage's operating account at Wachovia Bank, and U.S. Mortgage was required to pay the credit unions upon receipt of those loan proceeds. *Id.* ¶¶ 22, 24. The Debtors used the operating account to pay their payroll and operating expenses. *Id.*

The Trustee asserts here that after several years of operation, McGrath caused the Debtors to engage in fraudulent practices on a massive scale. These frauds included: (1) the use of loan proceeds from the sale of the Fannie Mae Loans in order to resolve cash flow problems, Amend. Compl. ¶¶ 25-26, and delaying the remittance of the Fannie Mae loan proceeds to the credit unions, delays that initially lasted only short periods of time and eventually by 2008 stretched to two years or more, *id.* ¶¶ 28-30;   (2) the fraudulent sale by U.S. Mortgage of some of the loans serviced by CU National, which involved McGrath's misrepresentation that he was an officer of the credit unions and the execution of false assignments of the credit union loans to the Debtor, U.S. Mortgage, *id.* ¶¶ 33-34; (3) the alleged fraudulent sale of over $20,000,000 of loans to Fannie Mae that were not serviced by the Debtor and the resulting modifications of the loan servicing system to conceal that sale such that Fannie Mae would receive loan servicing information and the monthly payments, *id.* ¶¶ 38-39; and (4) various investments made using the

Debtors' funds in an effort to raise the finds required to cover the Debtors' operational expenses and to conceal the fraudulent activities (the "Investment Scheme"). *Id.* ¶ 40.

Most relevant to the instant adversary proceedings, during the period of the fraudulent activities, McGrath further "engaged in various investments" using the Debtors' funds to try to raise the funds required to cover the Debtors' operational expenses and to conceal the fraudulent activities. In the Amended Complaint, the Trustee alleges that "Upon information and belief, because of the frequency of their trading activities," the Debtors (through McGrath) were top revenue generators for the brokerage firms with which they did business and had direct access to the owners and/or high level executives of the brokerage firms. The Trustee further alleges that due to the high frequency of trades, the brokerage firms excused the Debtors and McGrath from following "certain guidelines and regulations the brokerage firms required of their investors." Am. Compl. ¶¶ 41-44.

On June 11, 2009, the U.S. Attorney for the District of New Jersey filed a criminal information against McGrath, alleging that all of the fraudulent activities mentioned above were part of a criminal conspiracy that caused more than $100 million in losses. *Id.*   ¶ 44-45 (incorporating the Criminal Information by reference). In the Criminal Information, the U.S. Attorney alleged that "the object of the conspiracy, which caused more than $100 million in losses, was to fraudulently sell Credit Union Loans and to use the proceeds to finance [U.S. Mortgage's] operations and fund McGrath's personal investments and investments made on [U.S. Mortgage's] behalf." Am. Compl. ¶ 45 (both quoting Criminal Information ¶ 8). Further, the U.S. Attorney alleged, in order to conceal the fraudulent sales of Credit Union Loans to Fannie Mae, U.S. Mortgage employees would transfer the proceeds of the sales from U.S. Mortgage's bank account into bank and brokerage accounts "controlled by defendant McGrath

individually, with his wife jointly, through his corporate alter egos or for [U.S. Mortgage]."
Criminal Information ¶ 15. In order to conceal over $100 million in transfers "back and forth
between [U.S. Mortgage's] bank accounts and bank and brokerage accounts controlled by or
benefitting defendant McGrath," the U.S. Attorney alleged that McGrath directed U.S. Mortgage
employees to create false accounting records and bank statements. Criminal Information ¶ 16.
The same day the criminal information was filed, McGrath pled guilty to the charges set forth in
it and allocated to the stated allegations among others. *Id.* ¶ 47.

In the Proposed Second Amended Complaint the Trustee alleges that as part of the
Investment Scheme, McGrath invested the Debtors' funds with Defendants, that Defendants
provided services to the Debtors and/or McGrath, assisting them with the purchase and sale of
security instruments. That on information and belief "Elizabeth Blume" was National
Financial's account representative that assisted and advised the Debtors and/or McGrath and that
McGrath and Blume knew each other well enough that when Blume would change brokerage
firms, McGrath would follow her. *Id.* ¶ 48-51.

On February 23, 2009, U.S. Mortgage filed a voluntary petition for relief under chapter
11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of New Jersey. On
April 1, 2009, CU National filed a voluntary petition for relief under chapter 11 of the
Bankruptcy Code. By Order of this Court dated April 13, 2009, the chapter 11 cases of the
Debtors were administratively consolidated. On March 13, 2009, the U.S. Trustee approved an
Unsecured Creditors Committee. The Debtors' Third Amended Joint Plan of Liquidation was
confirmed by this Court on October 26, 2009. Order Confirming Debtors' 3d Am. Joint Plan of
Liquid., *In re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Oct. 26, 2009), ECF No. 563.
The cases were substantively consolidated for post-confirmation purposes by order of this Court,

effective October 26, 2009. Order Authorizing Substantive Consol. of Debtors' Bankr. Estates for Post-Confirm. Purposes *Nunc Pro Tunc* to Oct. 26, 2009, *In re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Dec. 22, 2009), ECF No. 591. Pursuant to the provisions of the Confirmation Order, *id.* ¶ 16, Anthony R. Calascibetta was appointed Liquidating Trustee by the Official Committee of Unsecured Creditors. Notice of Appt. of Liquidating Tr., *In re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Nov. 20, 2009), ECF No. 592. On February 1, 2012, the Post-Confirmation Committee of Unsecured Creditors appointed Edward P. Bond, CPA, as the Substitute Liquidating Trustee ("Trustee"). Notice of Appt. of Substitute Liquidating Tr., *In re U.S. Mortg. Corp.*, No. 09-14301 (Bankr. D.N.J. Feb. 1, 2012), ECF No. 967.

1. Original Adversary Complaint

On February 22, 2011, the Liquidating Trustee filed this Adversary Proceeding against National Financial Services, Inc. ("NFS"), alleging five counts against the Defendants that stem from the investment relationship between Defendants and the Debtors. Also on February 22, 2011, the Trustee filed an Amended Complaint against NFS and J.P. Turner. (ECF No. 2). By way of the present cross-motion the Trustee has presented a proposed Second Amended Complaint. On that same date the Trustee filed nine similar adversary proceedings against financial institutions and broker dealers.

In the Amended Complaint, the Trustee alleges Defendants provided services to McGrath, U.S. Mortgage, and/or an entity owned and/or controlled by McGrath, assisting them with the sale and purchase of security instruments. During the period between February 9, 2006 and October 6, 2008, the Trustee alleges, Debtors made payments "to one or both of the Defendants which totaled $11,422,753 and other transfers in an amount not known to the

Trustee." Am. Compl. ¶ 14. The Trustee further alleges the payments made by the Debtors to the Defendants were used to purchase securities, to reimburse the Defendants for securities previously purchased, or to pay the Defendants commissions on behalf of one or more of the Customers. *Id.* ¶ 15.

The Trustee alleges five grounds for relief. Count I, "Accounting", alleges that the Trustee is entitled to an accounting from the Defendant of all funds received by the Defendant from the Debtors and the allocation of such funds, and the Trustee requests judgment against the Defendant for an accounting. *Id.* ¶¶ 21-22.

Count II, "Fraudulent Transfer" alleges that the transfers by the Debtors were made with actual intent to hinder, delay or defraud present and future creditors of the Debtors, the Debtors received less than a reasonable equivalent value in exchange for the transfers, the Debtors were insolvent at the time of the transfers or became insolvent as a result thereof and/or the Debtors were engaged in a transaction or were about to engage in a transaction for which property remaining with the Debtors had an unreasonably small capital and/or the Debtors intended to incur or believed they would incur debts that were beyond their ability to pay as same matured. Relying on 11 U.S.C. §§ 544, 548(a)(1), 550 and N.J.S.A. 25:2 *et seq.* (made applicable under 11 U.S.C. § 544) the Trustee requests judgment against Defendant for recovery of the transfers and directing Defendants pay sums owed and interest. Count III, Civil Conspiracy, and Count IV, Aiding and Abetting Civil Conspiracy and Fraud, allege the Defendant acted in concert with McGrath and that as a direct and proximate result of the Defendant's actions, the Debtors were damaged. Therefore, pursuant to 11 U.S.C. § 544 and applicable non-bankruptcy law, the Trustee is entitled to recover the damages sustained by the Debtors and seeks avoidance and recovery of the property. Count V, Conversion, alleges that through McGrath's fraud, the

Defendant unlawfully received the transfers from the Debtors and, as a direct and proximate result, the Debtors were damaged and thus, pursuant to 11 U.S.C. §§ 544 and 550, the Trustee is entitled to recover the total amount of the transfers from the Defendant and seeks avoidance and recovery of the property.

2. Subsequent Procedural History

On April 15, 2011, the Trustee filed a Motion to Allow the Trustee to file a Second Amended Complaint. ECF No. 7. That motion was subsequently withdrawn by the Trustee. On May 2, 2011, NFS filed a Motion to Dismiss, ECF No. 8, and, on May 9, 2011, Opposition to the Motion to Allow the Trustee to file a Second Amended Complaint, ECF No. 12. On June 2, 2011, the Trustee filed the instant Cross-Motion for Entry of a Second Amended Complaint. Cross-Mot. for 2d Am. Compl., ECF No. 15.

On July 29, 2011, the Trustee filed Opposition to NFS' Motion to Dismiss, ECF No. 16, and on July 29, 2011, NFS filed Opposition to the Cross-Motion for Second Amended Complaint, ECF No. 17.

On August 11, 2011, J.P. Turner joined in NFS' Opposition to Trustee's Cross-Motion for Second Amended Complaint. ECF No. 23.

On October 14, 2011, a Stipulated Dismissal was entered with respect to NFS. ECF No. 25.

On February 29, 2012, a Consent Order was entered substituting Edward Bond as Liquidating Trustee. ECF No. 30.

3. Cross-Motion for Entry of a Second Amended Complaint

In the Application for Entry of an Order Authorizing the Trustee to file a Second Amended Complaint, the Trustee argues that Rule 15(a)(2) allows parties to amend its pleading

only with the opposing party's written consent or the court's leave, and that the court should

"freely grant leave when justice so requires." Cross-Mot. App. for 2d Am. Compl. ¶¶ 10-11, ECF

No. 15-1. The Trustee asserts that the Second Amended Complaint contains additional factual

allegations and clarifies the causes of action, and includes an additional transfer of funds from

Debtors to Defendants, as discovered in a separate adversary proceeding, Adv. 11-1217, based

on information provided by J.P. Morgan Chase Bank, N.A.

The Proposed Second Amended Complaint ("Second Amended Complaint") defines the

"Transfers" as made between February 9, 2006 and October 8, 2008, totaling not less than

$11,422,753.00, and an additional transfer made on November 13, 2008, of not less than

$1,000,000.00. The Second Amended Complaint contains Count II "Intentional Fraudulent

Transfers" which alleges that within four years of the U.S. Mortgage petition date, the

Defendants received transfers from the Debtors in an amount not less than $12,422,753.00 and

other transfers not now known to the Trustee. The Trustee alleges that those transfers were

"made with actual intent to hinder, delay or defraud creditors of the Debtors." Relying on 11

U.S.C. §§ 548(a)(1)(A), 550 and N.J.S.A. 25:2-25a, 2-29 and 2-30 (made applicable under 11

U.S.C. § 544), the Trustee requests judgment against the Defendant to avoid the transfers and

recover the value of all of the transfers from the Debtors to the Defendant and for attorneys' fees

and costs of the suit. It also adds Count III, Constructive Fraudulent Transfers, alleging that

Debtors received less than a reasonably equivalent value in exchange for the transfers, and that

the Debtors were insolvent at the time of the transfers or became insolvent as a result of them,

was engaged in a business or transaction for which the property remaining with the Debtors was

unreasonably small capital, and that the Debtors and McGrath intended to incur debts beyond the

Debtors' ability to pay as the debts matured. The Trustee asserts that there exists at least one

creditor whose claim against the Debtors arose prior to the dates of each of the transfers made. Relying on 11 U.S.C. §§ 548(a)(1)(B), 550(a); N.J.S.A. 25:2-25b, 2-27a, 2-29 and 2-30 (made applicable by 11 U.S.C. § 544), the Trustee requests judgment against Defendants avoiding the transfers, for the amount of all transfers, attorneys' fees and costs of suit.

In the proposed Second Amended Complaint, the Trustee asserts state common law claims against J.P. Turner in Counts IV (Civil Conspiracy), V (Aiding and Abetting Civil Conspiracy and Fraud), and VI (Conversion).[1]  In the Amended Complaint, these claims each demanded "judgment against the Defendants for the avoidance and recovery of the 'Property' described above." (Amended complaint ¶¶ 34, 40). The Second Amended Complaint, however, removes the words "avoidance and recovery" from the demand for judgment made with each claim. (Second Amended Complaint ¶¶ 81, 88, & 94). Instead of "avoidance and recovery of the Property," the common law claims in the Second Amended Complaint request an award of "damages" for " for actual damages to be proven at trial" and "for the amount of the Property," citing "applicable non-bankruptcy law and Section 544 of the Bankruptcy Code" as the basis for relief.

4.  <u>Instant Motion to Dismiss</u>

On January 5, 2012, J.P. Turner filed its Motion to Dismiss All Non-Section 548(a)(1)(A) Claims of the Second Amended Complaint to Avoid and Recover Transfers and All Time-Barred Section 548(a)(1)(A) Claims Contained Therein. JPT Mot. to Dismiss, ECF No. 26.

In the Motion to Dismiss, J.P. Turner asserts that it is a registered securities broker, and that the Trustee is trying to avoid "payments made [by the Debtors] to purchase securities, to reimburse Defendants for securities previously purchased, or to pay Defendants' commission."

---

[1] In the proposed Second Amended Complaint the Conversion Count cites to § 550 rather than § 544 as the statutory basis for the state law conversion claim.

*Id.* (quoting 2d Am. Compl. ¶ 57). J.P. Turner argues that because it is a registered securities broker, the safe harbor provision of 11 U.S.C. § 546(e) means that the Court must dismiss all of the counts except for those alleging intentional fraud under 11 U.S.C. § 548(a)(1)(A). To support its application of the safe harbor provision, J.P. Turner distinguishes between the claims against it and those against NFS, stating that, pursuant to its internal policies, it had only non-discretionary trading authority in all of its brokerage accounts.

J.P. Turner argues that, pursuant to FRCP 12(b)(6) and 8(a)(1), the Adversary Complaint should be dismissed save for those in Count II (Intentional Fraudulent Transfers) that do not fail for time-bar reasons because the Trustee fails to state a claim upon which relief can be granted, as even the Second Amended Complaint fails to meet the standards set forth by the Supreme Court in *Iqbal* and *Twombley*, and by the Third Circuit in *County of Allegheny*.

Secondly, J.P. Turner argues that § 546(e) bars all of the claims asserted by the Trustee except for those under § 548(a)(1)(A). It asserts that § 546(e) bars the avoidance of margin payments and settlement payments made by or to securities brokers except for those related to fraud (under 548(a)(1)(A)). JPT Mot. to Dismiss Mem. of L. at 8 (explaining the legislative history of § 546(e), i.e., to "minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries") (quoting H.R. Rep. No. 97-420, at 1, reprinted in 1982 U.S.C.C.A.N. 583, 583; citing *Enron Creditors Recovery Corp. v. Alfa*, 651 F.3d 329 (2d Cir. 2011)).

J.P. Turner cites *Hechinger Inv. Co.*, 274 B.R. 71 (D. Del. 2002) to support its position that the safe harbor provision of § 546(e) applies to every transaction that constitutes a settlement payment, "without exception." *Hechinger*, 274 B.R. at 72. In the Third Circuit, it argues, the term "settlement payment" has been interpreted very broadly. JPT Mot. to Dismiss Mem. of L. at

9 (citing *In re Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Savings & Loan Ass'n,* 878 F.2d 742, 752 (3d Cir. 1989) and other Circuit Courts of Appeals). J.P. Turner cites to the Trustee's proposed Second Amended Complaint at ¶ 57 itself ("the Transfers made by the Debtors to the Defendants were used to purchase securities, to reimburse the Defendants for securities previously purchased or to pay the Defendants' commissions") to argue that the Trustee clearly conceded that the Transfers at issue were "made to 'complete . . . securities transaction[s]' and, thus, unquestionably, constitute settlement payments under Third Circuit law." *Id.* at 10-11 (citing *In re Resorts Int'l, Inc.,* 181 F.3d 505, 515 (3d Cir. 1999); *Plassein Int'l Corp.,* 590 F3d 252, 258 (3d Cir. 2009)). J.P. Turner argues that the Trustee's allegation of fraud does not exclude the transfers from the definition of settlement payments, because 11 U.S.C. § 741(8), in which 'settlement payment' is defined, does not limit, but includes the phrase "commonly used in the securities trade" as a catch-all provision for those transactions not traditionally defined as a settlement payment. *Id.* at 11 (citing *Enron Creditors Recovery Corp. v. Alfa,* 651 F.3d 329 (2d Cir. 2011), *In re Resorts Int'l, Inc.*).

J.P. Turner also argues that § 546(e) applies because the transfers were made in connection with a securities contract. Section 546(e) bars recovery of transfers made by, to, or for the benefit of a stockholder "in connection with a securities contract" as defined in § 741(7). Thus, J.P. Turner argues, while the Court need not reach the question of whether the transactions were in connection with a securities contract, if it does address that question, the recovery of the transfers is also barred on that ground.

J.P. Turner argues that § 544(b) does not authorize the Trustee to assert non-avoidance, damage claims under state law. J.P. Turner argues that the state law claims in Counts II-VI brought pursuant to § 544 are barred because § 546(e) preempts the assertion of common law

damages claims against J.P. Turner — it asserts that the statute does not empower the Trustee to pursue non-avoidance damages claims under state law, as well as more relevantly barring the avoidance of a transfer that is a settlement payment. *See id.* at 17-19 (extensively quoting the Delaware Bankruptcy Court's decision in *Hechinger Investment Co.*). Further, J.P. Turner argues, the assertion of common law claims is barred by the doctrine of *in pari delicto*, i.e., that "a plaintiff may not assert a claim against a defendant is the plaintiff bears fault for the claim." *Id.* at 20-23 (citing *In re Norvergence*, 405 B.R. 709, 748 (Bankr. D.N.J. 2009); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356 (3d Cir. 2001)), and that the Trustee cannot defeat J.P. Turner's *in pari delicto* defense by relying on the "adverse interest" exception, <u>citing</u> *Norvergence*, 405 B.R. at 748, as the "sole actor" exception applies to impute the agent's fraudulent conduct to the principal's corporation, where as here McGrath's fraudulent conduct benefitted the Debtors, and/or McGrath controlled and dominated the Debtors such that the Debtors were the alter egos of McGrath. *Id.* at 20-23. Thus J.P. Turner argues that 11 U.S.C. § 546(e) bars the 548(a)(1)(B) claims, i.e., the constructive fraud claims, because the transfers alleged in the Complaint constitute settlement payments. *Id.* at 15 (citing *In re Resorts Int'l, Inc.*, 181 F.3d at 514).   Additionally, it argues, the Trustee cannot escape the provisions of § 546(e) by merely relabeling his avoidance claims in Counts IV – VI as "damages" claims.

J.P. Turner asserts that the proposed Second Amended Complaint fails to allege a sufficient basis to compel J.P. Turner to submit to an accounting, such that Count I of the Complaint should be dismissed, <u>citing</u> *Onderfonk v. Presbyterian Homes of N.J.*, 425 A.2d 1057, 1062, n.4 (N.J. 1981); *Borough of Kenilworth v. Graceland Mem. Park Ass'n*, 199 A. 716, 717 (N.J. Ch. 1938).

J.P. Turner further argues that the statute of limitations serves as a time-bar to all § 548(a) claims in counts II and III involving pre-February 23, 2007 transfers. Under § 548(a)(1), the transfers must have occurred no more than two years prior to the petition date in order to satisfy the statute of limitations. Here, U.S. Mortgage's bankruptcy petition was filed on February 23, 2009, and thus any transfer that occurred prior to February 23, 2007 is not subject to avoidance. J.P. Turner alleges that 5 of the 42 identified transfers occurred prior to that date, specifically, transfers of February 9, 2006; March 14, 2006; March 15, 2006; April 7, 2006; and May 4, 2006. J.P. Turner asserts that these transfers total $379,056.

Additionally, J.P. Turner argues that the "new" November 13, 2008 transfer "in an amount not less than $1,000,000.00" (which was included in the Second Amended Complaint, but not the First Amended Complaint), is time barred under 11 U.S.C. § 546(a)(1) because the Trustee's claim is untimely, because the Cross-Motion for Second Amended Complaint was not filed until June 2, 2011, some two years and four months (approximately) after the petition filing date. J.P. Turner further argues that the doctrine of relation-back does not insulate the November 2008 transfer (the newly-added transfer) from dismissal because the Second Amended Complaint fails to allege the requisite commonality between that transfer and the prior transfers alleged in the First Amended Complaint.

The Trustee filed Opposition to the Motion to Dismiss on April 3, 2012. ECF No. 36. In it, the Trustee argues that the efforts to use the safe harbor provision must fail. First, the Trustee asserts that the Transfers at issue are not the type of payments that Congress sought to shield from avoidance pursuant to 11 U.S.C. § 546(e) because the Transfers are not "settlement payments." The Trustee argues that the Transfers are not "settlement payments" because they are not "ordinary by any means" due to the massive fraud engaged in by McGrath. Therefore,

14

the Transfers fall outside of the provisions of 11 U.S.C. § 546(e).   However, the Trustee

concedes that "JP Turner is a stockbroker and that the Transfers were made in connection with a

securities contract." *Id.* at 11.  The Trustee urges that the transfers do not fit within the definition

of "settlement payment".  The Trustee asserts that here, McGrath engaged in a massive fraud,

and that under these circumstances the payments were not "commonly used in the securities

trade."  The Trustee further argues that § 546(e) does not shield J.P. Turner from the Trustee's

state law claims because the Trustee's claims under § 544 are not seeking to avoid settlement

payments or margin payments; rather, the Trustee is seeking common law damages and equitable

remedies.  Therefore, the Trustee argues that Counts IV, V and VI are <u>not</u> precluded by § 546(e),

<u>citing</u> *In re Fin. Management Sciences Inc.*, 261 B.R. 150, 156 (Bankr. W.D. Pa. 2001); *In re*

*Loranger Mfg. Corp*, 324 B.R. 575, 582 (Bank W.D. Pa. 2005).  The Trustee further argues that

§ 546(e) does not provide a safe harbor for the Constructive Fraudulent Transfer claim (Count

III) because the Transfers are "not ordinary course transfers" under any circumstances and thus

are not "settlement payments."  *Id.* at 13.  The Trustee further argues under the confirmed plan

he is authorized to pursue these common law damage claims and that they are not preempted by

§ 546(e), citing *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71 (D. Del. 2002) (noting there that

the *Hechinger* Court did not dismiss the breach of fiduciary claims on § 546(e) grounds).

    Further, the Trustee argues that J.P. Turner's "participation in [McGrath's] fraud"

prevents J.P. Turner from relying on the *in pari delicto* defense. The Trustee also argues that the

doctrine is factually intensive and therefore should not be considered on a motion to dismiss. He

states that there is an "adverse interest exception" to the doctrine, which he alleges applies here

based on McGrath's fraudulent conduct and J.P. Turner's participation in McGrath's fraud.

Should the Court apply the doctrine, the Trustee further asserts that the "sole actor" exception to the "adverse interest" exception does not apply in the instant matter.

As to the claim for Accounting (Count I), the Trustee argues that an accounting is warranted because J.P. Turner had a fiduciary duty to the Debtors because the Debtors delegated discretionary trading authority to J.P. Turner.   The Trustee argues that the claims are "indisputably" timely pursuant to the four year limitations period under N.J.S.A. 25:2-31. Finally, the Trustee asks that if the Court finds that the Second Amended Complaint is subject to dismissal, the Trustee be permitted to amend the Complaint.

On April 20, 2012, J.P. Turner filed a Reply Memorandum of Law.  ECF No. 39.  In its Reply, J.P. Turner argues that dismissal of the Complaint is required because the Trustee has failed to establish a plausible basis for his claims.  J.P. Turner asserts that § 546(e) bars the assertion of all substantive claims in the Complaint, except for those in Count II under § 548(a)(1)(A) for intentional fraud.  J.P. Turner contends that in the Trustee's opposition, the Trustee affirmatively conceded that § 546(e) is applicable by admitting that "JP Turner is a stockbroker and that the Transfers were made in connection with a securities contract", two facts that trigger the application of § 546(e) under the plain language of the statute. *Trustee Opp.* at 11.  J.P. Turner further reiterates its argument that § 546(e) is also triggered because the Transfers are "settlement payments."   J.P. Turner disputes the Trustee's contention that the Trustee may still assert § 548(a)(1)(B) claims due to the fraudulent conduct on the part of McGrath and the Debtor.  J.P. Turner argues that the authorities cited by the Trustee in support of that position are inapplicable in the instant matter because those cases involved fictitious securities transactions, whereas the Transfers at issue in this matter arose in connection with the actual purchase of common place public securities from a market participant which the Debtors

and McGrath utilized to perpetuate their fraud. Accordingly, those transfers are "squarely within the reach of Section 546(e)." J.P. Turner further argues that the state law common law claims in Counts IV-VI do not escape the safe harbor provision because the Trustee has merely relabeled the avoidance claims as damages claims, citing *In re Hechinger Inv. Co. of Del.,* and the plan, while preserving causes of action, cannot create causes of action. J.P. Turner also notes that unlike in *Hechinger,* the Complaint here does not allege any breach of fiduciary claims against J.P. Turner.

Additionally, J.P. Turner argues that *in pari delicto* is applicable because the doctrine, an affirmative defense, may be used as a basis for dismissal of a complaint, in contrast to the Trustee's assertion. J.P. Turner argues that *in pari delicto* is applicable in the instant matter because the imputation of McGrath's conduct to the Debtors or to Defendants is not relevant because "Trustee concedes that Debtors engaged in fraud." Further, J.P. Turner asserts that the "adverse interest" exception does not bar application of the *in pari delicto* defense and states that the "sole actor" exception supports application of the defense. Therefore, the Court must dismiss the Trustee's common law claims in Counts IV-VI pursuant to the *in pari delicto* defense.

J.P. Turner asserts that the statute of limitations for actions pursuant to 11 U.S.C. § 548(a)(1) clearly bars the Trustee's untimely § 548 claims, referring to 5 of the 42 transfers that occurred prior to February 23, 2007, and that the November 2008 $1 million transfer is time-barred under 11 U.S.C. § 546(a) because the Trustee filed the Cross-Motion to add the claim two years and four months after the order for relief and it does not "relate back" pursuant to the relation back doctrine under F.R.C.P. 15(c).

Finally, as to the claim for Accounting (Count I), J.P. Turner argues that the Trustee has not met the requirements to plead a claim for accounting because accounting is an equitable

17

remedy and the Trustee does not lack an adequate remedy at law.  Further, J.P. Turner asserts

that because all the accounts at issue in the instant matter were "non-discretionary" trading

accounts, the Trustee has failed to show that J.P. Turner owed a fiduciary duty to the Debtor.

   5.  J.P. Turner Motion for Summary Judgment

       On January 20, 2012, J.P. Turner filed a Motion for Summary Judgment. JPT Mot.

Summ. J., ECF No. 27.  In it, J.P. Turner argues that the Trustee, in order to recover the subject

transfers pursuant to 11 U.S.C. § 550, needs to show that J.P. Turner is either a "transferee" or

the entity for whose benefit the transfers were made.

       J.P. Turner argues that it is not a transferee for two reasons. First, it alleges that it never

received the transfers, per the separate Clearing Agreements between J.P. Turner and NFS and

Penson Financial Services.  J.P. Turner argues that because in the Clearing Agreements, NFS and

Penson agree to take responsibility for the transfers, it can be shown that J.P. Turner never

actually received the transfers. Further, J.P. Turner argues, even if it did "receive" the transfers,

it was a "mere conduit" and thus the transfers cannot be recovered.  Second, it argues, it never

had full dominion or control because it never obtained use of the funds.  In support, it points to

the Clearing Agreements, as well as to the names of the accounts into which the transferred

funds were placed by NFS and Penson, which state that the accounts are for the use of McGrath

or entities controlled by McGrath.

       J.P. Turner also argues that it is not the entity for whose benefit the transfers were made

because the most compelling indicia, that it is the entity that compelled the transfers, is not

present.  It argues that it did not ask for the transfers and did not get any benefit from the

transactions until McGrath opted to do something with the funds that had been transferred. It

asserts that the transfers were made for the benefit of McGrath himself, as well as U.S. Mortgage and Evenflow Funding (an entity controlled by McGrath), which also received the transfers.

On April 3, 2012, the Trustee filed his Opposition Brief to the Motion for Summary Judgment, arguing that "genuine issues of fact abound." T'ee Opp'n to Mot. Summ. J., ECF No. 35. While the Trustee relies on an old version of Rule 56, (the current language, as correctly stated in the Motion for Summary Judgment and J.P. Turner's Reply Brief, is whether there is a "genuine dispute of material fact"), its arguments may still be considered, as the change in wording did not alter the case law or standard for summary judgment.

Essentially, the Trustee argues that the Motion for Summary Judgment is premature. He alleges that factual issues remain as to J.P. Turner's access to the accounts into which the funds were transferred; whether J.P. Turner had discretionary trading authority; and several other issues. The Trustee alleges that J.P. Turner had discretionary trading authority, a disputed fact. The Trustee argues that J.P. Turner did not address questions of fact with respect to its access to the accounts and alleges that J.P. Turner made a profit from trading funds in the accounts into which the funds were transferred and thus is the entity for whose benefit the transfers were made, thus making J.P. Turner a transferee sufficient for the definition in § 550.

Finally, the Trustee argues that the Motion for Summary Judgment is premature because there has been no discovery in the case to date. Further, the Trustee argues that the Motion for Summary Judgment is premature because J.P. Turner has not even filed an Answer, simply the two dispositive motions. The Trustee argues that J.P. Turner has not sufficiently provided facts to answer factual questions raised by the Trustee in the Second Amended Complaint and thus to grant the Motion for Summary Judgment would be premature, "based on the procedural posture of the instant case."

On April 20, 2012, J.P. Turner filed a Reply Brief in Support of its Motion for Summary Judgment. In it, J.P. Turner argues that the Trustee's arguments are invalid. First, it points out that the Trustee did not, as required by D.N.J. Local Civil Rule 56.1 when disputing a motion for summary judgment, specifically indicate which material facts are at issue and/or in dispute, nor did he provide his own statement of material facts. Further, J.P. Turner argues, the Trustee does not support his arguments about discretionary or non-discretionary trading authority, that being the Trustee's unsupported allegations that J.P. Turner had decision making authority and could direct the disposition of funds in the NFS and Pension Account, or about the profit or benefit received by J.P. Turner again, with any factual support. J.P. Turner argues that this is no more than "bare-bones" pleading, which does not meet the standard to defeat a motion for summary judgment, as provided in FRCP 56(c)(1).

6.  <u>May 21, 2012 Hearing</u>

On May 21, 2012, this Court heard arguments on J.P. Turner's Motion to Dismiss, J.P. Turner's Motion for Summary Judgment, and Liquidating Trustee's Motion for Entry of an Order Authorizing Trustee to File a Second Amended Complaint. At the hearing, counsel for J.P. Turner clarified that the motions to dismiss and for summary judgment are based not just on the original complaint but on the proposed amended complaint as well.

As to the Motion to Dismiss, the most significant issue is the safe harbor provision of § 546(e) which relates to all claims in the dismissal motion other than the intentional fraud (Count II) and accounting (Count I) claims. The Motion to Dismiss also addresses time-barred claims for the intentional fraud claims (Count II). Counsel for J.P. Turner argued that the safe harbor provision can be triggered in one of two ways: (1) when the transfer of a settlement payment is made by, to or for the benefit of a stockbroker or (2) when the transfer is made by, to or for the

benefit of the stockbroker in connection with a securities contract. J.P. Turner asserted that the

instant matter meets both sets of standards. J.P. Turner argued that the Trustee's papers

"affirmatively concede that J.P. Turner is a stockbroker and that the transfers at issue were made

in connection with the securities contract." J.P. Turner further argued that the safe harbor

provision applies because this action deals with a settlement payment "commonly used in the

securities trade" as defined under § 741(8) that is made by, to or for the benefit of a stockholder.

J.P. Turner characterized the transactions in the instant matter as J.P. Turner serving as a

broker/dealer making non-discretionary trades on behalf of its clients. J.P. Turner rejected the

notion that these transactions were fictitious purchases of stock or phantom securities

transactions to fall outside of transactions "commonly used in the securities trade". J.P. Turner

urged that these transactions were *bona fide* securities transactions, not sham transactions. J.P.

Turner also argued that the Trustee is attempting to merely re-label common law claims from

"avoidance and recovery" claims in the amended complaint to "damage claims" in the proposed

Second Amended Complaint, which does not remove the claims from the safe harbor provision,

as discussed in the *Hechinger* case. J.P. Turner did not contest the fact that the Trustee had

authorization by way of the confirmed plan to bring common-law damage claims – but instead

contested the Trustee's ability to meet the standards to sustain the claims being pursued herein.

J.P. Turner also addressed the *in pari delicto* arguments, including the adverse interest exception

and the sole actor exception. J.P. Turner clarified that the *in pari delicto* argument is an

additional argument to the safe harbor provision argument. As to the issue of the claims being

time-barred, J.P. Turner argued that while 5 of the 42 transfers do not fall outside of the four-

year reach-back period under New Jersey state law, they do fall outside of the two-year reach

back period of § 548(a)(1)(A). Further, J.P. Turner argued that the November 13, 2008 transfer

as it relates to the additional $1,000,000.00 claim is time-barred because the claim was raised

two years and four months after the petition filing date by way of the filing of the motion for

authorization to file the second amended complaint on June 2, 2011. As a result, it was filed four

months past the date with which the trustee can bring that complaint under § 546(a)(1). As to the

accounting claim, J.P. Turner argued that there is a legal remedy available, and thus, as an

equitable remedy, the claim for accounting should fail. Further, J.P. Turner argued that there is

no fiduciary relationship, which is a necessary element for a claim for accounting to succeed as

the transactions involved nondiscretionary brokerage accounts.

    In response, counsel for the Trustee first asserted that the Trustee should be able to

conduct discovery into the nature of the relationship between Mr. McGrath and Ms. Blume

because the nature of the relationship between Mr. McGrath and Ms. Blume "suggests" that

maybe the contracts were not always followed. As for the safe harbor provision arguments,

counsel for the trustee conceded "that J.P. Turner is a broker and there was a securities contract

involved here." However, the trustee argued that a question of fact remains as to whether the

transfers at issue fall within the definition of "settlement payment." It is not the Trustee's

contention that this case involved fictitious securities. However, the Trustee argues that the

relationship between J.P. Turner as broker and McGrath suggests that there was "something

going on here beyond regular securities transactions", as every time Ms. Blume changed

brokerage firms, McGrath would follow her. As to the asserted common-law claims, the Trustee

argued that those claims were not avoidance claims, so that in fact, *Hechinger* supports retention

of these state court claims. Counsel for the Trustee urged that *in pari delicto* is a fact-intensive

affirmative defense and it is premature to determine its applicability on a motion to dismiss, and

in any event, the adverse interest exception applies here and McGrath's conduct was clearly

adverse to the Debtors and the sole actor exception should not apply, as other high ranking U.S.

Mortgage employees participated in the fraud. As to the statute of limitations claim, the trustee

conceded that the $1,000,000.00 November 13, 2008 transfer is outside the statute of limitations

and should not relate back. However, the trustee asserted that all of the transfers, including five

outside the two-year reach back period of § 548 survive under the four-year statute of limitations

period under New Jersey State law and accordingly, all the transfers survive under § 544.

As for the accounting claim, the Trustee argued that under New Jersey law a fiduciary

relationship exists between a broker and client where there is discretionary trading authority

given to the broker and that here, given the close relationship between McGrath and Ms. Blume,

the terms of the agreements may not have been followed. In any event the Trustee asks for

discovery on what the Trustee asserts are complicated accounts.

J.P. Turner urged that while J.P. Turner did have an employee, Lizabeth Blume, and

McGrath followed her from her previous firm to J.P. Turner, such is common in the financial

industry. Moreover, counsel for J.P. Turner noted that no further evidence of a "close"

relationship between the parties has been submitted. As to the claim for accounting, J.P. Turner

urged that these transactions are not complex, account statements have been submitted and that

there is no other information that the Trustee needs to understand the nature of the transactions.

J.P. Turner again urged that the affirmative defense of *in pari delicto* applies here.

J.P. Turner characterized these transactions as "typical ordinary transactions" which were

meant to be protected under the safe harbor provision.

As to the Motion for Summary Judgment, J.P. Turner argued that the Trustee is presently

seeking to avoid and recover the value of 41 transfers between February 9, 2006 and October 6,

2008 from J.P. Turner totaling $10,899,496.83 along with an unexplained NHB Adjustment in

the amount of $523,256.17 for a total amount of $11,422,753.00. J.P. Turner explained that in

each of these 41 transfers, the Debtors transferred funds to a clearing house, National Financial

Services, for deposit into securities accounts that were controlled by the clearing firm or carried

by the clearing firm and titled in the name of McGrath or entities he controlled. Once these

funds were deposited into these accounts, they were then used to purchase securities to pay for

securities previously purchased. Even if this Court deems these transfers avoidable, J.P. Turner

argued that the Trustee may only recover the value of those transfers if the Trustee demonstrates

that J.P. Turner is either an initial transferee or the entity for whose benefit the transfers were

made, pursuant to § 550(a). J.P. Turner asserted that the Trustee cannot make either showing.

J.P. Turner further asserted that the trustee did not submit a separately filed response to J.P.

Turner's statement of facts. Accordingly, pursuant Fed. R. Civ. P. 56(e) and Local Civ. R. 56.1,

the Court may treat facts as undisputed for purposes of the motion for summary judgment in

favor of the moving party. As well, J.P. Turner argued that the Trustee did not submit an

affidavit under R. 56(d) identifying what specific discovery is needed in order to respond.

　　　J.P. Turner reiterated at oral argument its position that under relevant case law J.P. Turner

is not an initial transferee that actually received the funds and had the ability to exercise full

dominion and control over the funds. J.P. Turner argued that, in fact, it is a subsequent

transferee who received subsequent transfers in the form of commission payments, and therefore,

cannot be deemed the entity for whose benefit a transfer was made – such that the Trustee cannot

satisfy the requirements of § 550(a)(1) as a matter of law. In support, J.P. Turner pointed to

documentation submitted here of wire transfers for 38 of 41 transfers which show deposits with

the clearing firm's bank account at J.P. Turner, as well as account statements and the clearing

house agreements; and the statement of Dennis S. Madej, Associate Director of Compliance at

J.P. Turner, wherein Madej states that J.P. Turner did not receive any of the subject transfers.
J.P. Turner argued that having established that J.P. Turner did not receive the funds, the Court
need not reach the issue of whether or not J.P. Turner exercised dominion and control over the
funds.

In response, counsel for the Trustee asserted that at this stage of the case, it is unclear
what dominion, control and access J.P. Turner had to the funds in the accounts and the Trustee
was not prepared to concede what access J.P. Turner had to the funds since the Trustee has not
yet had an opportunity to conduct discovery. Therefore, granting the motion for summary
judgment would be premature.

As to the Motion for Entry of an Order Authorizing Trustee to Enter a Second Amended
Complaint, counsel for the Trustee asserted that the purpose of the motion to amend was simply
to add in more factual information to the second amended complaint and also to add the
November 13, 2008 $1,000,000.00 transfer, which the trustee has now withdrawn. In response,
counsel for J.P. Turner argued that it makes sense for judicial economy purposes to hold the
Motion to Amend in abeyance until the Court determines the Motion to Dismiss and Motion for
Summary Judgment as the amended complaint in the form of the proposed Second Amended
Complaint is futile. J.P. Turner suggested that the Court rule on the Motion to Dismiss and on
the Motion for Summary Judgment and the Trustee be granted leave to submit a further amended
complaint to correct factual allegations.

7. March 28, 2013 Conference Call and Supplemental Submissions to the Court

On March 28, 2013, this Court conducted a conference call with counsel for the Trustee
and J.P. Turner. The Court sought clarification on several points and invited the parties to
provide supplemental submissions to the Court on such matters.

On April 5, 2013, counsel for J.P. Turner submitted a supplemental letter to the Court in response to the Court's March 28, 2013 inquiries. In the letter, J.P. Turner confirmed that its Motion to Dismiss seeks an order dismissing all non-Section 548(a)(1)(A) claims of the Amended Complaint and all time-barred Section 548(a)(1)(A) claims therein.   To clarify footnote 5 of J.P. Turner's Motion to Dismiss, which states that J.P. Turner does not seek the dismissal of claims related to pre-February 2007 transfers in Counts II and III of the Amended Complaint that arise under § 544 and N.J.S.A. 25:2-31, J.P. Turner stated that this statement was intended to advise the Court that J.P. Turner does not rely upon the statute of limitations as a basis to obtain the dismissal of such transfers.  However, J.P. Turner's Motion to Dismiss does rely upon § 546(e) as a basis to obtain the dismissal of those same claims.   J.P. Turner further advised the Court that there have been no material developments in case law since the Court held oral argument on May 21, 2012 that would affect J.P. Turner's Motion to Dismiss or J.P. Turner's Motion for Summary Judgment.

On April 12, 2013, counsel for the Trustee submitted a letter in response to J.P. Turner's supplemental submission to the Court. In the letter, the Trustee asserts that § 546(e) does not protect J.P. Turner from the Trustee's state law claims under § 544.  Specifically, the Trustee argues that the activities engaged in by McGrath which gave rise to the intentional fraud claims under § 548(a)(1)(A) are the activities which give rise to the claims alleged under state law theories. As such, the Trustee asserts they are not protected by § 546(e).  The Trustee cites to *Lehman Bros. Holdings, Inc.*, which states that "[t]he safe harbors necessarily do not extend to the open waters of litigation and are not an impenetrable barrier to other claims against a market participant that has behaved in a manner that may expose the actor to potential liability." 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012).  The Trustee argues that in this case, as in the *Lehman*

case, the trustee's claims are grounded in the actual fraudulent intent exhibited by Michael McGrath in carrying out his scheme. The transfers to the defendants were of a kind and nature that took them out of the regular business practices that are not intended to be protected by the "safe harbors" of § 546(e). Accordingly, the Trustee argues that the counts asserting state law claims should not be dismissed. The trustee further advised the Court that he is not aware of any changes in facts or law that would impact the issues being decided by the Court in these motions.

On April 17, 2013, counsel for J.P. Turner submitted a letter in response to the Trustee's April 12, 2013 letter to the Court. J.P. Turner argues that while the Trustee's letter advises the Court that there have been no "changes in the law that would impact the issues being decided by the court in these motions," the Trustee discusses a 2012 case decided before the Court held oral argument in this matter – *In re Lehman Bros. Holdings, Inc.,* 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012). The Trustee cites that case to support the Trustee's position that § 546(e) does not preempt the Trustee's state law claims made pursuant to § 544. J.P. Turner argues that the *Lehman* court agreed with the reasoning expressed in the *Hechinger* case, 274 B.R. 71 (D. Del. 2002), where the court dismissed an unjust enrichment claim pursuant to § 546(e) on the grounds that such claim effectively acted as an avoidance claim and arose out of the same facts as the avoidance claims. The *Lehman* court, however, declined to dismiss the common law claims at issue in that case since such claims were "unlike classic avoidance claims for constructively fraudulent transfers and have more in common with claims grounded in actual fraudulent intent." *Lehman*, 469 B.R. at 451. J.P. Turner argues that the state common law claims asserted in the instant matter by the Trustee in Counts IV, V and VI of the proposed Second Amended Complaint are nearly identical to the claims for avoidance of constructively fraudulent transfers asserted in Count III of the same pleading. Further, J.P. Turner argues that the common law

claims arise out of the same set of facts as the avoidance claims, and seek to effectuate the same

objective – the avoidance and recovery of the Transfers or the funds used to make the Transfers.

Therefore, to permit the Trustee to move forward by simply re-labeling his avoidance claims as

common law claims for "damages" would frustrate the purpose and intent of § 546(e).

Accordingly, J.P. Turner requests that the Court grant its Motion to Dismiss and Motion for

Summary Judgment.

LEGAL STANDARDS

### *I. Motion to Dismiss Standard*

Federal Rule of Civil Procedure 8(a), made applicable in bankruptcy court by Federal

Rule of Bankruptcy Procedure 7008, requires that a "pleading that states a claim for relief must

contain:

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief."

Fed. R. Civ. P. 8(a); Fed. R. Bankr. P. 7008.

Parties seeking to dismiss a complaint for failure to state a claim may do so on motion

pursuant to Federal Rule of Civil Procedure 12(b)(6), which is made applicable in bankruptcy

court by Federal Rule of Bankruptcy Procedure 7012. Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P.

7012.

When considering a motion to dismiss, a court must accept all well-pleaded allegations in

the complaint as true, view them in the light most favorable to the plaintiff, and determine

whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).

The United States Supreme Court has set forth a two-step analysis for adjudicating a motion to dismiss. *Iqbal*, 129 S. Ct. at 1949-50. First, a court should identify and reject labels, conclusory allegations, and formulaic recitation of the elements of a cause of action. Second, a court must draw on its judicial experience and common sense to determine whether the factual content of a complaint plausibly gives rise to an entitlement to relief. The court must infer more than the mere possibility of misconduct. *Id.* This does not impose a "probability requirement" at the pleading stage, but requires a showing of "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

In deciding motions to dismiss under Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of the claim. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). A court may also take judicial notice of a prior judicial opinion. *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

## II. § 546(e) "Safe Harbor" Standard

### 1. Generally

Section 546(e) of the Bankruptcy Code provides a "safe harbor" by protecting certain types of transfers from avoidance actions. See *Brandt v. B.A. Capital Co., LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258-59 (3d Cir. 2009), *cert. denied*, 130 S. Ct. 2389 (2010) (section 546(e) "shields certain settlement payments from a trustee's power to avoid a transfer as fraudulent."). The purpose of § 546 is "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." *Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp)*, 913 F.2d 846, 848 (10th Cir. 1990).

Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) ("Safe Harbor Provision").

Congress enacted this broad prohibition on the avoidance of margin payments and settlement payments in order to "minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries," and "prevent the insolvency of one commodity or security firm from spreading to other firms and possible [*sic*] threatening the collapse of the affected market." H.R. Rep. No. 97-420, at 1, *reprinted in* 1982 U.S.C.C.A.N. 583, 583.

2. _Settlement Payment_

The term "settlement payment" has a somewhat circular definition. Section 741 of the Bankruptcy Code defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8).

The Third Circuit has interpreted the term "settlement payment" very broadly. In _Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Savings & Loan Ass'n,_ 878 F.2d 742 (3d Cir. 1989), the Third Circuit noted that § 546 is at the intersection of "two important national legislative policies ... on a collision course" - the policies of bankruptcy and securities law. 878 F.2d at 751. In _Bevill,_ the Third Circuit addressed the meaning of "settlement payment" under § 546(f) in a securities transfer under repurchase or "repo" agreements, but that interpretation of "settlement payment" is applicable in the context of § 546(e). _See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),_ 181 F.3d 505, 515 (3d Cir. 1999), _cert. denied,_ 120 S. Ct. 531 (1999) (noting that "[s]ection 546(f) is similar to section 546(e) except that it applies specifically to settlement payments made 'by or to a repo participant in connection with a repurchase agreement.'")

In _Bevill,_ the Third Circuit found that the term "settlement payment" has an "extremely broad" definition, consistent with Congress's intent. _Id._ at 751. The court held that a "'settlement payment' may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, and that it includes transfers which are normally regarded as part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process for the particular type of transaction at hand." _Id._ at 752.

The Third Circuit further defined the term "settlement payment" in *In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999). In that case, the court held that "[i]n the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction." 181 F.3d at 515 (citing *Kaiser Steel Corp v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990)). The court further held that the term "settlement payment" is a broad one that "includes almost all securities transactions." *Id.* This Court notes the definition of "settlement payment" found in *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451 (Bankr. S.D.N.Y. 2006). In that case, the court held that "[i]n the securities industry, 'any transfer of cash or securities made to complete a securities transaction is considered a settlement payment.'" *Id.* at 456 (citing *Walsh v. The Toledo Hosp. (In re Fin. Mgmt. Scis., Inc.)*, 261 B.R. 150, 154 (Bankr. W.D. Pa. 2001)); *see also Enron Creditors Recovery Corp. v. Alfa*, 651 F.3d 329 (2d Cir. 2011) (holding that early redemption payments of commercial paper are "settlement payments" within the meaning of § 741(8) and thus protected by the safe harbor provision of § 546(e) and that nothing in the text of § 741(8) or the Bankruptcy Code support a purchase or sale requirement).

### 3. *Exceptions to "Safe Harbor" Protection*

There are certain instances where systemic fraud in a case will move a court not to apply the safe harbor provision because such fraud affects whether a transaction properly constitutes a "settlement payment." When systemic fraud is present, the transaction runs afoul of the portion of § 741(8) definition of the term "settlement payment" that includes the phrase "any other similar payment *commonly used* in the securities trade." 11 U.S.C. § 741(8)(emphasis added). Courts have declined to apply § 546(e) in cases typically involving phantom or fictitious securities transactions and transfers that are either illegal or not normally regarded as part of the

settlement process. *See In re Grafton Partners,* 321 B.R. 527, 541 (B.A.P. 9th Cir. 2005)(the

court declined to apply § 546(e) in a case involving an illegally unregistered security because an

illegally unregistered security "can hardly be described as a 'payment commonly used in the

securities trade.'"); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406,

481 (S.D.N.Y. 2001)(the court declined to apply § 546(e) where fictitious securities transaction

involved because the payments were "so steeped in fraud" that they were not of the type

"commonly used in the securities trade."); *Wider v. Wootton (In re Wider),* 907 F.2d 570 (5th

Cir. 1990)(court declined to apply § 546(e) where fictitious securities transaction involved).

4. *"Stockbroker" and "Securities Contract" Defined*

Section 546(e) also applies when a transfer is made by, to or for the benefit of a

stockbroker, securities clearing agent or other referenced entity in connection with a "securities

contract," as defined in § 741(7) of the Bankruptcy Code.

Section 101(53A) of the Bankruptcy Code provides:

(53A) The term "stockbroker" means person –

    (A)    with respect to which there is a customer, as defined in section
            741 of this title; and

    (B)    That is engaged in the business of effecting transactions in
            securities –

            (i)    for the account of others; or
            (ii)    with members of the general public, from or for such
                 person's own account.

11 U.S.C. § 101(53A).

Section 741(7) provides:

(7) "securities contract" –

    (A) means—

(i) a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option, and including any repurchase or reverse repurchase transaction on any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in section 101);

(ii) any option entered into on a national securities exchange relating to foreign currencies;

(iii) the guarantee (including by novation) by or to any securities clearing agency of a settlement of cash, securities, certificates of deposit, mortgage loans or interests therein, group or index of securities, or mortgage loans or interests therein (including any interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such settlement is in connection with any agreement or transaction referred to in clauses (i) through (xi));

(iv) any margin loan;

(v) any extension of credit for the clearance or settlement of securities transactions;

(vi) any loan transaction coupled with a securities collar transaction, any prepaid forward securities transaction, or any total return swap transaction coupled with a securities sale transaction;

(vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph;

(viii) any combination of the agreements or transactions referred to in this subparagraph;

(ix) any option to enter into any agreement or transaction referred to in this subparagraph;

(x) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this subparagraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix); or

(xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or

> to a stockbroker, securities clearing agency, financial institution, or
> financial participant in connection with any agreement or transaction
> referred to in this subparagraph, but not to exceed the damages in
> connection with any such agreement or transaction, measured in
> accordance with section 562; and
>
> (B) does not include any purchase, sale, or repurchase obligation under a
> participation in a commercial mortgage loan;

5. *Preemption Doctrine and § 546(e)*

Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, § 2,

state laws that interfere with or are contrary to federal law are preempted and without effect.

*Cipollone v. Liggett Group, Inc.* 505 U.S. 504, 516 (1992).  State law may be preempted by

federal law either expressly or impliedly.  *Orson, Inc. v. Miramax Film Corp.,* 189 F.3d 377,

381-82 (3d Cir. 1999), *cert. denied,* 120 S. Ct. 1286 (2000).  In cases where there is no explicit

statutory language preempting state law:

> There are two circumstances where courts will find preemption: (i) conflict
> preemption, where the state law and federal law directly conflict such that the two
> together cannot coexist either because "compliance with both federal and state
> regulations is a physical impossibility" or there is "an inevitable collision between
> the two schemes of regulation."; and (ii) field preemption, where the scheme of
> federal regulation is sufficiently comprehensive to make reasonable the inference
> that Congress "left no room" for supplementary state regulation.

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin.
Group (In re Hechinger Inv. Co. of Del),* 274 B.R. 71, 96 (D. Del. 2002)(citing *Florida Lime &
Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-43 (1963)); *Orson,* 189 F.3d at 381-82.

In *Hechinger,* an unsecured creditors' committee brought an adversary proceeding raising

claims for fraudulent conveyance, breach of fiduciary duty, unjust enrichment, and equitable

subordination against certain former directors and controlling shareholders of the corporate

debtor as well as certain lenders and investors who financed the leveraged buyout (LBO) of the

debtor.  The court first addressed the fraudulent conveyance claim, holding such claim should be

dismissed pursuant to the safe harbor provision § 546(e). *In re Hechinger Inv. Co. of Del.,* 274

B.R. at 89. Next, the court addressed the claim for breach of fiduciary duty and dismissed the

claim as to some defendants but not as to others. *Id.* at 98. Finally, the court addressed the

unjust enrichment claim, finding such claim to be preempted by § 546(e) of the Bankruptcy

Code. *Id.* In arriving at its conclusion regarding preemption of the unjust enrichment claim, the

court found that "the rationales that underlie both conflict and field preemption support a finding

of preemption here." *Id.* at 96. The court further stated:

> The Committee seeks the same remedy under its unjust enrichment claim as that
> sought under its fraudulent transfer claim – to avoid the transactions and recover
> payments that were made in exchange for the tender of Hechinger shares by
> Hechinger shareholders. However, the court has found above that, pursuant to
> section 546(e), the Committee is barred from using its avoidance powers to
> recover payments made to shareholders in the Hechinger LBO transaction.

> If the court were to entertain the Committee's unjust enrichment claim, a claim
> that effectively acts as an avoidance claim against the shareholders in a
> transaction that the court has already found is an unavoidable settlement payment,
> and allowed the Committee to circumvent section 546(e) by asserting a state law
> claim for unjust enrichment based on the same facts and seeking *essentially the
> same relief*, the purpose of section 546(e) would be frustrated. Claims that
> Congress deemed unavoidable under sections 544(b) and 546(e) of the
> Bankruptcy Code can not be avoided by simply re-labeling avoidance claims as
> unjust enrichment claims; if they could, the exemption set forth in section 546(e)
> would be rendered useless. Because the Committee's unjust enrichment claim
> effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts
> with the remedial exemption set forth in Code section 546(e). Allowing recovery
> for unjust enrichment here would implicate the same concerns regarding the
> unraveling of settled securities transactions more than one year after settlement,
> which is precisely the result that section 546(e) precludes. Allowing recovery for
> unjust enrichment here would implicate the same concerns regarding the
> unraveling of settlement securities transactions more than one year after the
> settlement, which is precisely the result that section 546(e) precludes.

> Alternatively, the court also finds that the Committee's unjust enrichment claim is
> preempted because the Bankruptcy Code, particularly sections 544 and 546(e),
> provides an exclusive framework for addressing claims that seek to avoid
> transfers made more than one year before bankruptcy. Thus the Code preempts
> the field and precludes supplemental state remedies because the Code alone
> comprehensively addresses such claims.

The Bankruptcy Code addresses claims that seek to recover payments and provides a remedy for such claims. In section 544, it allows a debtor to avoid, under certain circumstances, payments that would be avoidable outside of bankruptcy by a creditor under state law. But the Code also explicitly limits and displaces state law by setting forth federal limits on the use of state law avoidance powers under section 544, providing that a settlement payment may not be avoided in bankruptcy. 11 U.S.C. § 546(e). By providing and circumscribing the remedies for the conduct alleged, Congress necessarily intended to displace inconsistent state law claims and remedies.

*Id.* at 96-97 (internal citations omitted) (emphasis added).

Therefore, circumventing the provision of § 546(e) by merely re-labeling avoidance actions but seeking essentially the same relief frustrates the purpose of § 546(e). Thus, common law claims for damages that are merely "re-labeled" avoidance actions are preempted by the Code so as not to render § 546(e) "useless."

In *In re Lehman Brothers Holdings Inc.*, Judge Peck discussed the limits of § 546(e) and the preemption of state law claims. 469 B.R. 415 (Bankr. S.D.N.Y. 2012). The Amended Complaint in that case set forth forty-nine separate counts seeking relief on multiple theories. *Id.* at 434. The court held that the "safe harbor" provision did not foreclose unjust enrichment, constructive trust, breach of implied covenant of good faith and fair dealing, conversion, and other such claims. The court explained:

The safe harbors are not all encompassing and do not offer "fail safe" protection against every cognizable claim made in relation to transactions that may fit within the statutory framework. The safe harbors necessarily do not extend to the open waters of litigation and are not an impenetrable barrier to other claims against a market participant that has behaved in a manner that may expose the actor to potential liability. In sum, these important protections do not grant complete immunity from every conceivable claim made by Plaintiffs.

*Id.* at 450.

Defendants in the *Lehman* case argued that the safe harbor provision of § 546(e), as federal bankruptcy law, preempts certain of the Plaintiffs' unjust enrichment and conversion

claims, citing *Contemporary Indus. Corp. v. Frost (In re Contemporary Indus. Corp.),* 564 F.3d

981 (8th Cir. 2009) and *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del.,*

*Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)* 274 B.R. 71 (D. Del.

2002) in support of such argument. *Id.* at 451. The *Lehman* court distinguished those cases

from the matter before it, stating:

> In both of these cases, however, the unjust enrichment claims were identical to the
> plaintiffs' constructively fraudulent transfer claims under the Bankruptcy Code and also
> were based upon the same facts as these constructive fraud claims. This litigation is
> different. The claims that [Defendant] argues should be preempted by federal bankruptcy
> law are unlike classic avoidance claims for constructively fraudulent transfers. Instead,
> these claims have more in common with claims grounded in actual fraudulent intent.
> These claims are not to be treated as replicas of claims to recover constructively
> fraudulent transfers…

*Id.* at 451 (internal citations omitted).

The court further elaborated that the claims Defendant argued should be preempted were

not based on the same facts or nor did they seek the same relief as the claims protected by §

546(e). The court held that state law claims based on "facts that are entirely distinct" from those

necessary to state a claim for the kinds of constructively fraudulent transfer under §§ 544 or 548

that are protected by the safe harbor of § 546(e) "should not be wiped out by the safe harbors."

*Id.* at 459.

The *Lehman* case has been distinguished in *AP Services LLP v. Silva,* 483 B.R. 63

(S.D.N.Y. 2012). In *AP Services LLP,* the court found that the trustee's claim for unjust

enrichment was preempted by § 546(e) because that claim "seeks to recover the same payments

… held … unavoidable under § 546(e)." *AP Services LLP,* 483 B.R. at 71. However, the court

held that claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty

were not preempted by the safe harbor provision of § 546(e) because such claims seek money

damages, and "[p]ayment of money damages would not implicate the danger against which

38

Section 546(e) is intended to protect – unwinding settled securities transactions." *Id. at 72; see also Contemporary Indus. Corp. v. Frost,* 564 F.3d 981, 988 (8th Cir. 2009)(dismissing unjust enrichment and illegal and/or excessive shareholder distributions claims because "[a]llowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section."); *Securities Investor Protection Corp. v. Bernard L. Madoff Inv. Securities LLC,* 476 B.R. 715, 722-23 (S.D.N.Y. 2012)(finding that § 546(e) bars a trustee from pursuing claims made under 11 U.S.C. § 548(a)(1)(B) and § 544); *Picard v. Katz,* 462 B.R. 447, 453 (S.D.N.Y. 2011)(court dismissed claims to avoid payments as preference payments, constructive fraudulent conveyances, and both actual and constructive fraudulent conveyances under New York state law).

### III. Good Faith Transferee and § 548(c)

Section 548(a)(1)(A) does not fall within the purview of the safe harbor provision of § 546(e). Section 548(a)(1)(A) governs intentional fraudulent transfers and permits the avoidance of a transfer where the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted…" 11 U.S.C. § 548(a)(1)(A).  However, § 548(c) provides that a transferee or obligee of a fraudulent transfer or obligation who takes for value and in good faith may retain the interest transferred or the obligation incurred.  That section states:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or oblige of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or oblige gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).  The statute further provides, in subsection (d)(2)(B):

> A commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency that receives a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment as defined in section 101 or 741 of this title, *takes for value to the extent of such payment...*

11 U.S.C. § 548(d)(2)(B)(emphasis added).  Section 741 of the Bankruptcy Code defines

"settlement payment" as "a preliminary settlement payment, a partial settlement payment, an

interim settlement payment, a settlement payment on account, a final settlement payment *or any*

*other similar payment commonly used in the securities trade.*"  11 U.S.C. § 741(8) (emphasis

added).  The Third Circuit has found that the term "settlement payment" should be interpreted

broadly and has held that "[i]n the securities industry, a settlement payment is generally the

transfer of cash or securities made to complete a securities transaction." *In re Resorts Int'l, Inc.,*

181 F.3d 505, 515 (3d Cir. 1999).  For a more in depth discussion of "settlement payments,"

refer *Legal Standard* II.2.

### *IV. Timeliness of Claims*

Section 548(a)(1)(A), which does not fall within the purview of the safe harbor provision

of § 546(e), expressly requires that avoidable transfers be made within two years before the

petition date.  Section 548(a)(1)(A) states:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> > (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted...

11 U.S.C. § 548(a)(1)(A).

Section 546(a) provides:

> (a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of--
>
> > (1) the later of--
> >
> > > (A) 2 years after the entry of the order for relief; or
> > >
> > > (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
> >
> > (2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

Under N.J.S.A. 25:2-31, claims stated pursuant to N.J.S.A. 25:2-25 *et seq.* have varying statute of limitations periods. N.J.S.A. 25:2-31 states:

> A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:
>
> > a. Under subsection a. of R.S.25:2-25, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was discovered by the claimant;
> >
> > b. Under subsection b. of R.S.25:2-25 or subsection a. of R.S.25:2-27, within four years after the transfer was made or the obligation was incurred; or
> >
> > c. Under subsection b. of R.S.25:2-27, within one year after the transfer was made or the obligation was incurred.

N.J.S.A. 25:2-31.

### *V. Accounting Standard*

As a threshold matter, an accounting is an equitable remedy. In order to be entitled to an equitable remedy, it must be shown that there is no adequate remedy at law. *See Rainbow Apparel, Inc. v. KCC Trading, Inc.,* 2010 U.S. Dist. LEXIS 51664, at *18-19 (D.N.J. May 26, 2010) (citing *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478 (1962)("'The necessary prerequisite

to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is [ ]

the absence of an adequate remedy at law.'")).

Once it has been shown that there is no adequate remedy at law, the court will look to

whether a claim for accounting has been established. Under New Jersey law, "[a]n accounting in

equity cannot be demanded as a matter of right or of course. The exercise of the equitable

jurisdiction to compel an account rests upon three grounds." *Borough of Kenilworth v.*

*Graceland Memorial Park Ass'n*, 199 A. 716, 717 (N.J. Ch. Div. 1938). The party seeking to

obtain an accounting must establish: (1) a fiduciary or trust relationship; (2) the complicated

nature of the character of the account; and (3) the need of discovery. *Id.*

Whether a fiduciary relationship exists between a broker and a client is dependent on

whether the broker's trading authority is discretionary or non-discretionary. *See, e.g.,*

*Lautenberg Found. v. Madoff,* 2009 WL 2928913, at *7 (D.N.J. Sept., 9, 2009)(Under "New

Jersey law, a fiduciary duty exists between a broker and a client 'where the customer has

delegated discretionary trading authority to the broker.'") *overruled on other grounds by*

*Belmont v. MB Inv. Partners, Inc.,* 2013 WL 646344, *7 (3d Cir. 2013); *McAdam v. Dean Witter*

*Reynolds, Inc.*, 896 F.2d 750, 767 (3d Cir. 1990)(holding that "at least when the client maintains

a discretionary account with a stockbroker, the broker is in a fiduciary relationship with that

client."); *Goodman v. Goldman, Sachs & Co.,* 2010 U.S. Dist. LEXIS 132593, at *11 (D.N.J.

Dec. 14, 2010) ("New Jersey law, in accordance with the law of most states, holds that there is

no fiduciary relationship between an investor and a broker where the investor maintains a non-

discretionary account with the broker, *i.e.*, an account over which the investor maintains control

over the investment decisions.").

### VI. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that a court shall "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056.[2]

The United States Supreme Court has defined an "issue of material fact" as a question which must be answered in order to determine the rights of the parties under substantive law, and which can only properly be resolved "by a finder of fact[,] because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, (1986); *see also Justofin v. Metropolitan Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004) ("A fact is material when its resolution 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'") (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986)); *Knauss v. Dwek* (Cooper, J.), 289 F. Supp. 2d 546, 549 (D.N.J. 2003); *Wanland and Assocs. Inc. v. Nortel Networks Ltd. (In re NorVergence, Inc.)* (Gambardella, J.), 384 B.R. 315, 370 (Bankr. D.N.J. 2008). The burden then shifts to the nonmoving party, who must present evidence establishing that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id.* The nonmoving party must "make a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will

---

[2] The quoted language is taken from the 2010 revision of Rule 56(a), which replaces the previous Rule 56(c). Notably, it replaces "genuine issue of material fact" with "genuine dispute as to any material fact." The cited cases all predate this new Code change and therefore use the older terminology.

bear the burden of proof at trial." *Cardenas v. Massey*, 269 F.3d 251, 254-55 (3d Cir. 2001); *In re NorVergence, supra,* 384 B.R. at 370.

Inferences and facts should be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir. 1995); *In re NorVergence*, 384 B.R. at 370. However, parties opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, supra,* 475 U.S. at 586. The nonmovant may not rely on mere allegations but must present actual evidence raising a genuine issue of material fact. *Anderson, supra,* 477 U.S. at 249. Likewise, a motion for summary judgment will not be defeated by "the mere existence" of some disputed facts. *American Eagle Outfitters v. Lyle & Scott, Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009). "If the evidence (offered by the nonmoving party) is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citation omitted). Only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Dehart v. Horn,* 390 F.3d 262, 267 (3d Cir. 2004).

Summary judgment may be proper even though some material facts remain disputed, if, after all inferences are drawn in favor of the non-moving party, the moving party is entitled to judgment as a matter of law. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804, 119 S.Ct. 1597, 143 L. Ed. 2d 966 (1999); *In re NorVergence*, 384 B.R. at 370. "[T]he inquiry involved in a ruling on a motion for summary judgment...necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252.

The Third Circuit has held that the purpose of summary judgment is to avoid an unnecessary trial which results in delay and expense, by promptly disposing of any actions in which there is no genuine issue of material fact. *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir. 1974); *Peller v. Syracuse Univ. (In re Peller)* (Gambardella, J.), 184 B.R. 663, 666 (Bankr. D.N.J. 1994). However, summary judgment is defined as a "drastic remedy" which is not to be granted liberally. *Tomalewski*, 494 F.2d at 884. The Third Circuit has stated that "where there is the slightest doubt as to the facts," summary judgment may not be granted. *Id.*; *see also Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981). At the summary judgment stage, therefore, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." *Knauss, supra,* 289 F. Supp. 2d at 549 (citing *Anderson,* 477 U.S. at 249).

## *VII. § 550(a) Standard*

### *1. Generally*

Section 550(a) of the Bankruptcy Code governs the liability of the transferee of an avoided transfer. Section 550(a) states:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

### *2. "Initial Transferee"*

The term "initial transferee" is not defined in the Bankruptcy Code. *In re Parcel Consultants, Inc.,* 287 B.R. 41, 46 (Bankr. D.N.J. 2002). However, in *In re Parcel Consultants, Inc.,* the court considered the meaning of "transferee" for purposes of § 550 and held:

> [I]n order to be a "transferee" of the debtor's funds, one must (1) actually receive the funds, and (2) have full dominion and control over them for one's own account, as opposed to receiving them in trust or as agent for someone else.

287 B.R. 41, 46 (Bankr. D.N.J. 2002).

In defining the terms "dominion and control," courts have held that "a transferee must have the legal right to use the funds to whatever purpose he or she wishes, be it to invest in 'lottery tickets or uranium stocks.'" *In re Parcel Consultants, Inc.,* 287 B.R. at 46 (citing *In re Anton Noll, Inc.,* 277 B.R. 875, 879 (1st Cir. B.A.P. 2002)); *see also Bonded Financial Service, Inc. v. European American Bank,* 838 F.2d 890, 893 (7th Cir. 1988)("Although the Bankruptcy Code does not define 'transferee', and there is no legislative history on the point, we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.").

### 3. *"Entity for Whose Benefit Such Transfer Was Made"*

In the seminal decision of the Seventh Circuit Court of Appeals, *Bonded Financial Service, Inc. v. European American Bank,* the Seventh Circuit held:

> [A] subsequent transferee cannot be the "entity for whose benefit" the initial transfer was made. The structure of the statute separates initial transferees and beneficiaries, on the one hand, from "immediate or mediate transferee[s]", on the other. The implication is that the "entity for whose benefit" is different from a transferee, "immediate" or otherwise. The paradigm "entity for whose benefit such transfer was made" is a guarantor or debtor-someone who receives the benefit but not the money.

838 F.2d 890, 895 (7th Cir. 1988)).

The *Bonded* court further held that "[s]omeone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language." *Id.*

The *Bonded* court also determined that based on the "inference from the structure" of § 550(a), the section "distinguishes transferees (those who receive the money or other property) from entities that get a benefit because someone else received the money or property." *Id.* In other words, "the categories 'transferee' and 'entity for whose benefit such transfer was made' are mutually exclusive..." *Id.* This holding was adopted by the United States District for the District of New Jersey in *YA Global Inv., L.P. v. Global Outreach, S.A.,* 2011 U.S. Dist. LEXIS 65106 (D.N.J. June 6, 2011) *aff'd* 2013 U.S. Dist. LEXIS 47652 (D.N.J. Mar. 28, 2013). In that case, the District Court analyzed whether § 550(a)(1) and § 550(a)(2) are mutually exclusive, holding "[t]he Court thus agrees with the Seventh Circuit in *Bonded,* and the weight of authority following that decision, that the categories in subsections (a)(1) and (a)(2) are mutually exclusive." *Id.* at *32.

### VIII. *Fed. R. Civ. P. 15(a)(2) "Amended Complaint" Standard*

Pleading amendments are governed by Fed. R. Civ. P. 15, made applicable to bankruptcy proceedings by Bankruptcy Rule 7015. Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend a pleading "once as a matter of course at any time before a responsive pleading is served." However, after amending once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2).

The Supreme Court articulated the standard for Fed. R. Civ. P. 15(a)(2) in *Foman v.*

*Davis.* In that case, the Supreme Court stated:

> In the absence of any apparent or declared reason – such as undue delay, bad faith
> or dilatory motive on the part of the movant, repeated failure to cure deficiencies
> by amendments previously allowed, undue prejudice to the opposing party by
> virtue of allowance of the amendment, futility of amendment, etc. – the leave
> sought should, as the rules require, be "freely given."

371 U.S. 178, 182 (1962); *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410,

1434 (3d Cir. 1997)("Among the grounds that could justify a denial of leave to amend are undue

delay, bad faith, dilatory motive, prejudice, and futility."). The Supreme Court further held that

"the grant or denial of an opportunity to amend is within the discretion of the District Court, but

outright refusal to grant the leave without any justifying reason appearing for the denial is not an

exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the

Federal Rules." *Id.*

The Third Circuit has held that if a claim is vulnerable to dismissal under Rule 12(b)(6)

and the plaintiff moves to amend, "leave to amend generally must be granted unless the

amendment would not cure the deficiency." *Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir. 2000).

### ANALYSIS

As a threshold matter, this Court's findings as to J.P. Turner's Motion to Dismiss and

Motion for Summary Judgment are based not just on the amended complaint but on the proposed

second amended complaint as well. Accordingly, this Court will distinguish between findings

relating to the amended and proposed amended complaint, when applicable.

**I.    Motion to Dismiss**

**A.   *Applicability of the § 546(e) Safe Harbor Provision***

This Court finds that the safe harbor provision of § 546(e) bars the assertion of all
monetary claims in the second amended complaint against J.P. Turner except for those in
Count II under § 548(a)(1)(A) (Intentional Fraudulent Transfers). Specifically, the safe
harbor provision mandates dismissal as to Count II (state law claims to avoid intentional
fraudulent transfers pursuant to the Trustee's strong-arm powers under § 544 only), Count III
(Constructive Fraudulent Transfers), Count IV (Civil Conspiracy), Count V (Aiding and
Abetting Civil Conspiracy and Fraud), and Count VI (Conversion). This Court reaches that
conclusion for three reasons. First, such transactions fall within the meaning of "settlement
payments" as defined by the Code and Third Circuit case law. Second, § 546(e) also applies
when a transfer is made by, to or for the benefit of a stockbroker, securities clearing agent or
other referenced entity in connection with a "securities contract," and the Trustee has
conceded, at oral argument and in his papers, that J.P. Turner is a stockbroker and that the
transfers at issue were made in connection with a securities contract. *See Opp.* at 11.
Further, this Court holds that § 546(e) bars the assertion of the state common law claims
pursuant to the Preemption Doctrine. Labeling these actions as state common law claims for
damages cannot circumvent the provisions of § 546(e).

    *1.  Settlement Payments*

      Section 741 of the Bankruptcy Code defines "settlement payment" as "a preliminary
settlement payment, a partial settlement payment, an interim settlement payment, a settlement
payment on account, a final settlement payment *or any other similar payment commonly used in
the securities trade*." 11 U.S.C. § 741(8) (emphasis added).

      The Third Circuit, in *In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999), further defined
the term "settlement payment." In that case, the court held that "[i]n the securities industry, a

settlement payment is generally the transfer of cash or securities made to complete a securities

transaction." 181 F.3d at 515 (citing *Kaiser Steel Corp v. Charles Schwab & Co.*, 913 F.2d 846,

849 (10th Cir. 1990)). The court further held that the term "settlement payment" is a broad one

that "includes almost all securities transactions." *Id.*

The Complaint itself alleges that the "transfers made by the Debtors to the Defendants

were used to purchase securities, to reimburse the Defendants for securities previously

purchased, or to pay the Defendants' commissions." Second Amended Complaint at ¶ 57; *see*

*also* Amended Complaint at ¶ 15 ("the payments made by the Debtors to the Defendant were

used to purchase securities, to reimburse the Defendants for securities previously purchased, or

to pay the Defendants commissions on behalf of one or more of the Customers."). Thus, even

the Trustee admits that the Transfers at issue were made to complete securities transactions. The

transfers constitute settlement payments under Third Circuit case law. *See In re Resorts Int'l,*

*Inc.,* 181 F.3d 505, 515 (3d Cir. 1999).

Further, this Court finds that the exception to whether a transfer constitutes a "settlement

payment" does not apply in the instant matter. The Trustee urged this Court to apply the

holdings of *In re Grafton Partners,* 321 B.R. 527 (B.A.P. 9th Cir. 2005), *Jackson v. Mishkin (In*

*re Adler, Coleman Clearing Corp.),* 263 B.R. 406 (S.D.N.Y. 2001), and *Wider v. Wootton (In re*

*Wider)*, 907 F.2d 570 (5th Cir. 1990). In those cases, the courts declined to apply § 546(e) in

cases involving phantom or fictitious securities transactions and transfers that are either illegal or

not normally regarded as part of the settlement process. The rationale behind such holdings is

that systemic fraud affects whether a transaction properly constitutes a "settlement payment."

When systemic fraud is present, the transaction runs afoul of the portion of § 741(8) definition of

the term "settlement payment" that includes the phrase "any other similar payment *commonly used* in the securities trade." 11 U.S.C. § 741(8)(emphasis added).

The instant matter is distinguishable from those cases cited by the Trustee notwithstanding the allegations raised as to Defendant's employees. While there is no question that McGrath engaged in a massive fraud, the alleged Transfers are bona fide actual purchases of securities from a market participant. Such transfers do not lose their status as "settlement payments" merely because the Trustee has alleged that they involved fraud by the Debtors.

2. *Transfer made by, to or for the benefit of a stockbroker in connection with a "securities contract"*

While this Court has determined that the Transfers at issues fall within the definition of "settlement payments" and thus fall within the purview of the safe harbor provision of § 546(e), this Court holds that § 546(e) applies to the Transfers for the separate reason that they occurred in connection with a "securities contract."

Section 546(e) applies when a transfer is made by, to or for the benefit of a stockbroker, securities clearing agent or other referenced entity in connection with a "securities contract," as defined in § 741(7) of the Bankruptcy Code. *See* 11 U.S.C. § 546(e).

At oral argument and in the Trustee's Memorandum of Law in Opposition to J.P. Turner's Motion to Dismiss, the Trustee conceded that J.P. Turner is a stockbroker and that the Transfers were made "in connection with a securities contract." *See Memo in Op.* at 11. Accordingly, this provides an additional basis for this Court to determine that the safe harbor provision of § 546(e) applies to the transfers in the instant matter.

**B. *Relabeling the State Common Law Claims Does not Remove them from the Safe Harbor Provision of § 546(e) (Counts IV, V, and VI)***

The Amended Complaint alleges that the fraudulent transfer claim in Count II is avoidable by the Trustee pursuant to 11 U.S.C. § 548(a)(1) and § 544. It further alleges state law claims in Counts III-V are avoidable by the Trustee pursuant to § 544 and applicable non-bankruptcy law. The plain language of § 546(e) bars the Trustee's § 544 state law claims as well as claims arising under § 548(a)(1)(B). Accordingly, this Court finds that under the Amended Complaint, Count II to the extent it asserts constructive fraudulent transfer claims and claims under § 544, and Counts III-V (Civil Conspiracy, Aiding and Abetting Civil Conspiracy and Fraud, and Conversion) must be dismissed pursuant to the safe harbor provision.

In the proposed Second Amended Complaint, the Trustee asserts state common law claims against J.P. Turner in Counts IV (Civil Conspiracy), V (Aiding and Abetting Civil Conspiracy and Fraud), and VI (Conversion). In the Amended Complaint, these claims each demanded "judgment against the Defendants for the avoidance and recovery of the 'Property' described above." (Amended complaint ¶¶ 34, 40). The Second Amended Complaint, however, removes the words "avoidance and recovery" from the demand for judgment made with each claim. (Second Amended Complaint ¶¶ 81, 88, & 94). Instead of "avoidance and recovery of the Property," the common law claims in the Second Amended Complaint request an award of "damages" for " for actual damages to be proven at trial" and "for the amount of the Property," citing "applicable non-bankruptcy law and Section 544 of the Bankruptcy Code" as the basis for relief.

As discussed in *Legal Standard* II.5 above, circumventing the provisions of § 546(e) by merely re-labeling avoidance actions but seeking essentially the same relief frustrates the purpose of § 546(e). *See In re Hechinger Inv. Co. of Del.*, 274 B.R. 71 (D. Del. 2002). Thus,

state law claims for damages that are merely "re-labeled" avoidance actions are preempted by the Code so as not to render § 546(e) "useless."

In this particular matter, like in *Hechinger*, the state law claims asserted by the Trustee effectively act as avoidance claims. Allowing the Trustee to pursue these state law claims would permit the Trustee to circumvent the safe harbor provision of § 546(e). Counts IV (Civil Conspiracy), V (Aiding and Abetting Civil Conspiracy and Fraud), and VI (Conversion) are all based on the same operative facts and seek effectively the same relief – the avoidance and recovery of the transfers or the funds used to make the transfers. *Compare In re Hechinger Inv. Co. of Del.,* 274 B.R. 71, 96 (D. Del. 2002) *with In re Lehman Bros. Holdings Inc.,* 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012).

Therefore, this Court finds that under the Proposed Second Amended Complaint, the state common law claims in Counts IV-VI must be dismissed pursuant to the safe harbor provision of § 546(e).

Accordingly, under either the Amended Complaint or the Proposed Second Amended Complaint, the state common law claims fall under the safe harbor provision of § 546(e).

Because the preemption doctrine applies in the instant matter, this Court need not address the arguments regarding the applicability of the doctrine of *in pari delicto* raised by J.P. Turner as to those claims that fall under the purview of the safe harbor provision of § 546(e). To the extent that J.P. Turner raises the doctrine of *in pari delicto* as to any remaining claims, the Court declines to apply the doctrine at the motion to dismiss stage given the fact-intensive nature of the doctrine.

To the extent the Trustee argues that he is authorized to assert common law claims for damages (Counts IV, V, and VI) pursuant to the Confirmed Plan, this Court agrees with J.P.

Turner's position that the Plan does not create causes of action but merely preserves causes of

action held by the Debtor. *See* JPT Reply at 13, ECF. No. 39.

### C. Timeliness of Claims

As to any § 548(a)(1)(A) claims that remain, claims for any transfers made before the two-

year reach back period are untimely. The U.S. Mortgage Petition Date was February 23, 2009,

and the two-year reach back period extends to February 23, 2007. The CU National Petition

Date was April 1, 2009 and the two-year reach back period for that Debtor extends to April 1,

2007. Accordingly, § 548(a)(1)(A) claims as to five of the forty-two transfers were made both

before February 23, 2007 and April 1, 2007 and must be dismissed.[3]

At the May 21, 2012 hearing before this Court, the Trustee conceded that the $1,000,000.00

November 13, 2008 transfer claim was raised by the Trustee more than two years after the

petition filing date outside the statute of limitations of 11 U.S.C. § 546(a)(1) and should not

relate back. Accordingly that issue will not be addressed by this Court.

### C. *Claim for Accounting (Count I)*

As a matter of law, the Court is not prepared to rule as to whether a fiduciary relationship

was present in the instant matter. The Trustee has alleged that the Debtors and J.P. Turner were

in a fiduciary relationship because the Debtors delegated discretionary trading authority to J.P.

Turner. Opp at 22. This Court agrees with the Trustee's assertion that the Trustee should be able

to conduct discovery into the nature of the relationship between the Debtors and J.P. Turner.

Because the finding of a fiduciary relationship is necessary to granting the claim for accounting,

this Court denies the Motion to Dismiss as to the Claim for Accounting (Count I). *See Borough*

*of Kenilworth v. Graceland Memorial Park Ass'n*, 199 A. 716, 717 (N.J. Ch. Div. 1938).

### II.    Motion for Summary Judgment

---

[3] These transfers occurred on February 9, 2006, March 14, 2006, March 15, 2006, April 7, 2006 and May 4, 2006.

In the instant matter, the Liquidating Trustee seeks to avoid and recover certain wire transfers of funds allegedly made by the Debtors to J.P. Turner that cumulatively exceed $11.8 million. In order for the Trustee to recover any funds from J.P. Turner, however, § 550 requires the Trustee to show that J.P. Turner is either (i) a "transferee" of the wire transfers made by the Debtors, (ii) the entity for whose benefit the wire transfers by the Debtors were made, or (iii) an immediate or mediate transferee of an initial transferee. At the May 21, 2012 hearing, the Trustee conceded that the November 13, 2008 transfer of $1 million was time-barred. Accordingly, currently at issue are 41 separate wire transfers of funds made by the Debtors totaling in excess of $10.8 million.

J.P. Turner argues that it did not receive the funds wired by the Debtors that the Trustee seeks to recover in this proceeding because in each of the 41 wire transactions at issue in the Complaint, funds were transferred from the Debtors to an account at J.P. Morgan Chase in the name of the clearing agent. *See* J.P. Turner's MSJ, at 17. Therefore, J.P. Turner asserts it can not be considered a "transferee" of the wire transfers. Further, J.P. Turner asserts that it never exercised "full dominion and control over" the funds wired by the Debtors. *Id.* at 18. Finally, J.P. Turner argues that because J.P. Turner is not a "transferee" of any wire transfers made by the Debtors, the Trustee may only preserve his claims against J.P. Turner if he demonstrates that J.P. Turner is the "entity for whose benefit such transfers were made." 11 U.S.C. § 550(a)(1). *See* J.P. Turner MSJ, at 21. J.P. Turner argues that it is McGrath and the account-holder entities controlled by McGrath, i.e., U.S. Mortgage and Evenflow Funding, who were the entities for whose benefit the wire transfers by the Debtors were made. *Id.*

In response, the Liquidating Trustee argues that prior to ruling on the instant case, several factual issues must be determined. Specifically, National Financial Services LLC ("National

Financial") and Penson Financial Services, Inc. ("Penson") acted as the clearinghouses for J.P. Turner's trading activities. *Opp. to MSJ,* at 2. The Transfers were sent from the Debtors to accounts held by National Financial and Penson at J. P. Morgan Chase (the "Chase Accounts"). *Id.* Then, National Financial and Penson deposited the Transfers into accounts in the names of Michael McGrath and Susan McGrath, U.S. Mortgage, Michael McGrath (individually) and Evenflow Funding LLC ("Evenflow") (collectively, the "JP Turner Brokerage Accounts"). *Id.* Based upon the nomenclature of the J.P. Turner Brokerage Accounts, J.P. Turner asserts that it did not receive the Transfers. *Id.* However, the Trustee alleges that J.P. Turner had discretionary trading authority over the J.P. Turner Brokerage Accounts. *Id.* At the May 21, 2012 hearing, counsel for the Trustee stated that the underlying issues regarding the relationship between the broker and the client and the access that J.P. Turner had to the funds in those accounts highlights the need for discovery in this matter.

Accordingly, notwithstanding J.P. Turner's argument that the Trustee has failed to provide a response to its statement of material facts, a genuine dispute as to material facts surrounding the wire transfers, such as J.P. Turner's status as a transferee or entity for whose benefit the transfers were made, exists in the current matter. Accordingly, this Court denies J.P. Turner's Motion for Summary Judgment. To the extent that J.P. Turner asserts the affirmative defense of *in pari delicto* to the intentional fraud claims arising under § 548(a)(1)(A), this Court finds that it would be premature to make a determination as to the applicability of the defense. *See Norvergence,* 405 B.R. 709, 749 (Bankr. D.N.J. 2009) (finding that "The *in pari delicto* doctrine is an affirmative defense that must be raised by the parties. ... Even though an affirmative defense is not routinely considered on a motion to dismiss, it may be entertained if it 'is established on the face of the complaint.'"). Here, the applicability of the *in pari delicto* defense to the §

548(a)(1)(A) claims is not established on the face of the Complaint. Therefore, dismissal of these counts based on the *in pari delicto* defense is premature at this time.

### III.    Motion to Amend the Complaint

A liberal standard governs pleading amendments, as articulated by the Supreme Court in *Foman v. Davis,* 371 U.S. 181, 182 (1962) and the text of Fed. R. Civ. P. 15(a)(2)("leave shall be freely given when justice so requires.")  Further, the Third Circuit has held that if a claim is vulnerable to dismissal under Rule 12(b)(6) and the plaintiff moves to amend, "leave to amend generally must be granted unless the amendment would not cure the deficiency." *Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir. 2000).

In the instant matter, this Court undertakes an analysis to determine whether permitting the Trustee's Motion for Entry of an Order Authorizing Trustee to File a Second Amended Complaint would be "futile" given this Court's rulings on J.P. Turner's Motion to Dismiss and Motion for Summary Judgment. *See Foman v. Davis,* 371 U.S. 181, 182 (1962)("In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment,* etc. – the leave sought should, as the rules require, be 'freely given.'")(emphasis added).

Under the Amended Complaint, Counts II (as to Constructive Fraudulent Transfers and § 544 state law claims only), III (Civil Conspiracy), IV (Aiding and Abetting Civil Conspiracy and Fraud), and V (Conversion) are all dismissed pursuant to the safe harbor provision of § 546(e).  Only Count I (Accounting) and II (Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A)) remain.

Under the Proposed Second Amended Complaint, Count II (state law claims to avoid intentional fraudulent transfers pursuant to the Trustee's strong-arm powers under § 544 only), Counts III (Constructive Fraudulent Transfer), IV (Civil Conspiracy), V (Aiding and Abetting Civil Conspiracy and Fraud), and VI (Conversion) are all dismissed pursuant to the safe harbor provision of § 546(e), as discussed fully in *Analysis* Part I.A. and I.B.   Counts I (Accounting) and II (Intentional Fraudulent Transfers under § 548(a)(1)(A) only) remain.

The Trustee proposes no amendment to Count I (Accounting). Accordingly, based on the holdings of this Court as they pertain to J.P. Turner's Motion to Dismiss and Motion for Summary Judgment, the proposed amendment only affects the factual information contained in the complaint as well as Count II (Intentional Fraudulent Transfers).

This Court finds that under the Fed. R. Civ. P. 15(a)(2) and the standard articulated in *Foman v. Davis*, the Trustee's Motion for Entry of an Order Authorizing Trustee to File a Second Amended Complaint should be granted to the extent consistent with this Opinion.

CONCLUSION

For the foregoing reasons, J.P. Turner's Motion to Dismiss the Second Amended Complaint is GRANTED IN PART and DENIED IN PART. J.P. Turner's Motion for Summary Judgment is DENIED. The Liquidating Trustee's Motion for Entry of an Order Authorizing Trustee to File a Second Amended Complaint is GRANTED in compliance with the ruling of the Court in this Opinion. Said Second Amended Complaint shall be filed and served within thirty (30) days of the date of this Opinion.

An order shall be submitted in accordance with this Opinion.

DATED:  April 23, 2013

ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE